IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.     APPROXIMATELY 635,281.016441 USDT SEIZED FROM ADDRESS TT29mEUxmdEJb1qG4XiakXaccXsy4p5uYw, and
2.     APPROXIMATELY 635,022 USDT SEIZED FROM ADDRESS TCYPVhwwQNz2H45zaFnVBtpQx5YpPiqeUD;

     Defendants.

---

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

---

The United States of America ("United States"), by and through United States Attorney Peter McNeilly and Assistant United States Attorney Kurt J. Bohn, pursuant to Supplemental Rule for Admiralty, Maritime and Asset Forfeiture Actions G(2), states:

### JURISDICTION AND VENUE

1.     The United States has commenced this action pursuant to the civil forfeiture provisions of 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C) and (b), seeking forfeiture of defendant assets based upon violations of 18 U.S.C. §§ 1343, 1349 and 1957. This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

2.     Venue is proper under 28 U.S.C. § 1395 because some of the acts described herein occurred in the District of Colorado.

1

**DEFENDANT PROPERTY**

3.    The defendant property is fully described as:

a. Approximately 635,281.016441 USDT seized from address TT29mEUxmdEJb1qG4XiakXaccXsy4p5uYw ("defendant 4p5uYw") seized on November 6, 2025, which is currently in the custody of the United States Marshals; and

b. Approximately 635,022 USDT seized from address TCYPVhwwQNz2H45zaFnVBtpQx5YpPiqeUD ("defendant PiqeUD"), seized on November 6, 2025, which is currently in the custody of the United States Marshals.

**Cryptocurrency Terms**

4.    Virtual currencies are digital tokens of value circulated over the internet as substitutes for traditional fiat currency. Virtual currencies are not issued by a government or bank like traditional fiat currencies such as the U.S. dollar but are generated and controlled through computer software. Bitcoin ("BTC") is the most well-known virtual currency in use.

5.    Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented by a string of alphanumeric characters.

6.    The identity of an address owner is generally anonymous, analysis of the blockchain can often be used to identify the owner of a particular address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

7.      Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address. A user of virtual currency can utilize multiple addresses at any given time and there is no limit to the number of addresses any one user can utilize.

8.      A "seed phrase" is a randomly generated list of 12 to 24 words that acts as the master key to a cryptocurrency wallet. A user can save the 12 to 24 words and enter them into a wallet to "recover" access to the wallet by regenerating the private key for the wallet. Essentially, they act like a password for the account that is easier to save and store than the private key itself.

9.      A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in a wallet.

10.      Many virtual currencies publicly record all their transactions on what is referred to as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable and historical record of every transaction that has ever occurred utilizing that blockchain's specific technology. The blockchain can be updated multiple times per hour and record ever virtual currency address that ever received that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies, to include the Bitcoin

3

blockchain and the TRON blockchain.

11.    Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

12.    Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

13.    USDT (also known as Tether) is a cryptocurrency that resides on multiple blockchains. The value of USDT is tied to the value of the U.S. dollar, making it what is known as a "stablecoin." USDT is issued by Tether Ltd., a company headquartered in the British Virgin Islands. USDT is hosted on the Ethereum and TRON blockchains, among others.

14.    TRX is a digital asset and cryptocurrency token that was created in 2017 by TRON Tech Limited decentralized blockchain platform that supports smart contacts and high throughput. TRX is used on the TRX Ledger, which is a distributed ledger system that uses a consensus protocol to verify transactions.

## FACTUAL BASIS FOR FORFEITURE

15.    Except as otherwise noted, all of the following facts and information have been discovered through my own investigation and observations, and the observations and investigations of fellow law enforcement officers as reported to me.

**Background of Investigation**

16.     On May 23, 2025, Special Agent Nathanael Wetlesen ("SA Wetlesen") who was assigned to the Federal Bureau of Investigation ("FBI") Las Vegas Field Office, received an Internet Crime Complaint Center referral form. The complaint form was filled out by a victim, K.K. residing in Colorado on May 18, 2025. K.K. reported that approximately $1,240,000.00 worth of BTC was stolen from his COLDCARD wallet (a hardware wallet that stores your Bitcoin seed words in dual secure elements and avoids being connected to a computer) while using an application called "Sparrow wallet."

17.     On May 28, 2025, SA Wetlesen interviewed K.K. regarding his complaint. K.K. had secured 12.64 BTC over several years and stored it on a COLDCARD wallet for security. In an attempt to secure a BTC-backed loan, K.K. downloaded the Sparrow wallet software onto his computer. The Sparrow software would enable third party entities to verify a wallet address and its contents. K.K.'s computer was having issues scanning the quick response (QR) code on the COLDCARD wallet. On May 4, 2025, K.K. decided to download what he believed was the Sparrow wallet application from the Apple App Store. Once downloaded, K.K. entered his seed phrases of his COLDCARD wallet into the Sparrow wallet application but received an error code in the application. On May 18, 2025, K.K. noticed that his COLDCARD wallet had been drained of 12.64 BTC. The transaction date that K.K. noted in his transaction history was May 16, 2025.

18.     On May 20, 2025, K.K. engaged zeroShadow, a cyber security and blockchain intelligence company, to analyze the fraudulent transaction. zeroShadow investigated, which resulted in tracing the stolen funds to the Subject Addresses. The report and supporting files were then provided to SA Wetlesen.

19.     SA Wetlesen used the Chainalysis Reactor (a powerful blockchain investigation software that allows users to trace funds across multiple blockchains, identify illicit activity, and link suspicious transactions to real-world entities) software tool to trace the transfer out of K.K.'s COLDCARD wallet.

**Scheme**

20.     K.K.'s cryptocurrency, totaling approximately 12.44890234 BTC was first transferred from the fifteen addresses in K.K.'s wallet to a fraudulent wallet ("Fraud wallet dljl5t"). From fraud wallet, the BTC was transferred in a series of transactions commonly called a "peel-chain." This technique is used to launder cryptocurrencies, by "peeling" off a small portion of the funds from the subject's wallet, then typically deposited with exchanges for conversion to fiat money. The small nature of the deposits raises fewer red flags and thus less likely to be marked for Anti-Money Laundering (AML) compliance. K.K.'s stolen BTC, this "peel-chain" was conducted over a series of thirteen transactions starting with Fraud wallet dljl5t.

21.     In each of the thirteen transactions, the receiving wallet "peeled" a portion of the stolen BTC to a cryptocurrency service. For two of the transactions, the "peel" was to a cryptocurrency exchange called Changelly. Changelly allows users to convert their cryptocurrency between different blockchains and different types of cryptocurrencies. SA Wetlesen requested transaction and account information regarding these two transactions from Changelly. Based on the records provided by Changelly, these two transactions were processed through their exchange, so Changelly accepted the input cryptocurrency and provided a wallet with the corresponding output cryptocurrency. K.K.'s two BTC were exchanged for Tether on the TRON network (USDT (TRC-20)), which is a

6

different blockchain from Bitcoin which supports cryptocurrencies like Tether), and both were sent to one address on the TRON network, defendant 4p5uYw. The two Changelly transactions totaled approximately 204,118.10 USDT.

22.    The remaining eleven transactions were peeled to a service known as Bridgers, which is a decentralized, cross-chain swapping protocol available for multiple blockchains. The output transactions on Bridger were all to one address on the TRON network, defendant 4p5uYw, the same address that the Changelly transactions were sent to. The services of Bridger were used to swap the stolen BTC to USDT on the TRON network. The eleven Bridger transactions totaled approximately 1,066,377.83 USDT.

23.    On or around May 17, 2025, the owner of defendant 4p5uYw, in two transactions moved approximately 635,020 USDT to defendant PiqeUD.

24.    The first transactions in defendant 4p5uYw showed that in early May 2025, this address received approximately 200,000 USDT over the course of three days with the majority coming from Bridger and the remaining coming from the same address used by Changelly for K.K's laundered funds. 173,009.087263 USDT was then transferred out of the account to a different address the following day.

25.    Over the following six days, approximately 140,000 USDT was received by defendant 4p5uYw from the same address used by Changelly for K.K.'s laundered funds. Days later, 140,000 USDT was transferred out of the account to a different address. Two smaller transactions brought the USDT balance to zero prior to the first transaction with K.K.'s laundered funds appearing in defendant 4p5uYw. Therefore, all the funds that were in defendant 4p5uYw (to include the funds sent to defendant PiqeUD) are traceable to K.K.'s stolen BTC.

26.    The use of a "peel chain" and attempts to move the cryptocurrency from BTC through exchange services like Changelly and Bridger, and into defendant 4p5uYw through a series of smaller transactions was an attempt to conceal the nature, source, location, ownership or control of the proceeds.

27.    On May 22, 2025, Tether Compliance voluntarily froze Tether addresses defendant 4p5uYw and defendant PiqeUD, based on allegations of fraud.

28.    On October 2, 2025, the Honorable Judge Neureiter approved a warrant for the seizure of the funds in defendant 4p5uYw and defendant PiqeUD. When agents prepared to submit the warrant, they realized that an unknown person had deposited 1 USDT into defendant PiqueUD on October 1, 2025 (the day before the application was submitted to the Court), so the balance was not 635,021 as contemplated in the original application but was now 635,022. An amended application was submitted to reflect that change, and Tether burned the entire content of that wallet for seizure.

### Conclusion

29.    There is probable cause to believe that the funds held by Tether, totalling approximately 1,270,303.02 USDT in defendant 4p5uYw and defendant PiqeUD, were directly involved in the receipt of funds linked to the fraud against K.K. (the victim).

30.    Accordingly, the defendant assets constitute or were derived from proceeds of wire fraud and conspiracy to commit fraud, and constitutes property involved in money laundering transactions, and are therefore forfeitable to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C) and (b).

## CERTIFICATION OF NATHANAEL WETLESEN, SPECIAL AGENT
## FEDERAL BUREAU OF INVESTIGATIONS

I, Special Agent Nathanael Wetlesen, hereby state and aver under the pains and penalties of perjury that I have read the foregoing Factual Basis for Forfeiture and that the facts and information contained therein are true.

*s/ Nathanael Wetlesen*
Nathanael Wetlesen
Special Agent – FBI

## FIRST CLAIM FOR RELIEF

1.      The Plaintiff repeats and incorporates by reference the paragraphs above.

2.      By the foregoing and other acts, defendant approximately 635,281.016441 USDT seized from address TT29mEUxmdEJb1qG4XiakXaccXsy4p5uYw, constitutes or was derived from proceeds traceable to violation of 18 U.S.C. §§ 1343, 1349 and 1957, and therefore is forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C) and (b).

## SECOND CLAIM FOR RELIEF

3.      The Plaintiff repeats and incorporates by reference the paragraphs above.

4.      By the foregoing and other acts, defendant approximately 635,022 USDT seized from address TCYPVhwwQNz2H45zaFnVBtpQx5YpPiqeUD, constitutes or was derived from proceeds traceable to violation of 18 U.S.C. §§ 1343, 1349 and 1957, and therefore is forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C) and (b).

WHEREFORE, the United States prays for entry of a final order of forfeiture for the defendant properties in favor of the United States, that the United States be authorized to dispose of the defendant properties in accordance with law, and that the Court enter a finding of probable cause for the seizure of the defendant properties and issue a Certificate of Reasonable Cause pursuant to 28 U.S.C. § 2465.

DATED this 26th day of November 2025.

Respectfully submitted,

PETER MCNEILLY
United States Attorney

By: s/*Kurt J. Bohn*
Kurt J. Bohn
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Ste. 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0405
E-mail: kurt.bohn@usdoj.gov
*Attorney for the United States*